**NATIONAL AIRLINES, INCORPORATED, Plaintiff-Appellee,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS et al., Defendants-Appellants.**

No. 27312.

United States Court of Appeals
Fifth Circuit.

Sept. 23, 1969.

Joseph P. Manners, Miami, Fla., Plato E. Papps, Gen. Counsel, IAMAW, Washington, D. C., Manners & Amoon, Miami, Fla., for plaintiff-appellee.

William B. Killian, Jerry B. Crockett, Miami, Fla., for defendants-appellants.

Before BELL and THORNBERRY, Circuit Judges, and CHOATE, District Judge.

THORNBERRY, Circuit Judge.

This case concerns the *status quo* or "freeze" provisions of the Railway Labor Act applicable to major disputes. It arises out of a wildcat strike by the carrier's employees while the orderly processes provided by the Act were running their course. The question is whether the carrier, under the unusual circumstances of this case, violated the status quo by discharging strikers who refused to return to work under court order. The district court held that it did not, and, accordingly, that the employees were not entitled to reinstatement. We REVERSE and REMAND.

On October 31, 1968, National Airlines and the International Association of Machinists and Aerospace Workers, AFL-CIO (Union) exchanged § 6 notices of desired changes in their collective bargaining agreement. The parties thereby invoked the elaborate procedures set forth by the Railway Labor Act for the resolution of major disputes, which the Supreme Court has recently outlined as follows:

* * * A party desiring to effect a change of rates of pay, rules, or working conditions must give advance written notice.. § 6. The parties must confer, § 2 Second, and if conference fails to resolve the dispute, either or both may invoke the services of the National Mediation Board, which may also proffer its services *sua sponte* if it finds a labor emergency to exist. § 5 First. If mediation fails, the Board must endeavor to induce the parties to submit the controversy to binding arbitration, which can take place, however, only if both consent.

§§ 5 First, 7. If arbitration is rejected and the dispute threatens "substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the Mediation Board shall notify the President," who may create an emergency board to investigate and report on the dispute. § 10. *While the dispute is working its way through these stages, neither party may unilaterally alter the status quo*. §§ 2 Seventh, 5 First, 6, 10. (Emphasis added)

Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344. Conferences between the parties failed to resolve the dispute over the suggested changes, and several matters were referred to the National Mediation Board in December, 1968. All events giving rise to this suit occurred after the procedures of the Act had been set in motion, but before their completion.

Against this background, National suspended three men on Friday, January 17, 1969, at Kennedy Airport for refusing to taxi an aircraft. The action of the men in question was in response to a controversial order issued by the carrier reducing the number of men needed to taxi an aircraft from three to two. The men apparently determined that the reduction created an unsafe condition. Almost immediately after the suspension, members of the Union sat down on the job at National's Kennedy Airport and Miami International facilities.

Later that same afternoon, National filed a suit in the court below seeking injunctive relief against the Union alleging that the Union had violated the status quo requirements of the Act and had breached the collective bargaining contract by participating in a strike or sit down. At an emergency hearing the next morning, January 18, 1969, a representative of the Union testified that the strike was an "unauthorized work stoppage or a sit down." The attorney for the Union stated that "we are having a difficult time getting them [the strikers]

back," and conceded that a preliminary injunction enjoining the strike was appropriate. The court entered a preliminary injunction ordering the Union to restore the *status quo* by ending the work stoppage. In addition, the Union sought and obtained a temporary restraining order requiring National to employ three men to taxi aircraft.[1]

Although National complied with the court's order on the taxi dispute, the Union's attempts to return the men to work were unsuccessful, and the strike continued. On January 20, the fourth day of the strike, the airline scheduled a second hearing before the district court, seeking further relief to compel compliance with the injunction. As a result of the strike, the airline had already cancelled approximately 36 flights. Representatives of the Union asserted that the employees disregarded the Union's orders to return to work and that the Union had lost control of its members. The first injunction issued by the court had proved ineffective. Accordingly, the district court entered a second order at 12:30 P.M. on the same day, ordering the defendants to "advise the membership that it is the order of the Court and of the defendant IAM that all men return to work by their next shift, and that individuals who refuse to so report are subject to penalties *which could include dismissal by NATIONAL AIRLINES."* (Emphasis added). At 3:41 P.M. that afternoon, the Union sent out 993 telegrams advising its members of the court's second order. Shortly thereafter, at approximately 7:00 P.M. that evening, National notified the strikers that they would be terminated if they did not report for duty at their next regularly scheduled shift starting at 3:30 P.M. the next day, January 21.

When the strikers did not return to work the next day at the 3:30 P.M. shift,

National sent termination notices to approximately 940 IAMAW workers. The Union promptly filed a motion to dissolve the orders enjoining and restraining the strike and, in addition, an "Application for Rule to Show Cause and Preliminary Injunction," seeking to require the reinstatement of all discharged employees. The district court denied the motion and application, and the Union appeals.

■ The Union's position is that the discharge of the striking employees violated the *status quo* or "freeze" provisions of the Railway Labor Act, and that the discharged employees are therefore entitled to reinstatement. The applicable provision of the Railway Labor Act is Section 6, 45 U.S.C. § 156, which provides in relevant part:

> In every case where such notice of intended change has been given, or conferences are being held with reference thereto, or the services of the Mediation Board have been requested by either party * * * *rates of pay, rules, or working conditions shall not be altered by the carrier* until the controversy has been finally acted upon, as required by section 155 of this title * * *. [Emphasis added].

"The purpose of § 6 was to prevent rocking of the boat by either side until the procedures of the Railway Labor Act were exhausted." Manning v. American Airlines, Inc., 2d Cir. 1964, 329 F.2d 32, 35. "[T]he legislative history of the statute shows the 'freeze' provisions were intended to enforce a 'cooling off' period upon both labor and management * * *." Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 2d Cir. 1962, 307 F.2d 21, 45, n. 11 (dissenting opinion). Consequently, where a dispute is working its way through the processes provided by the Act, "neither party may unilaterally alter the *status*

1. Since the filing of this appeal, the district court has sustained the Union's position on the taxi dispute, holding that National violated the *status quo* by changing the number of men required to taxi an aircraft after the procedures of the Act were set in motion by the § 6 notices on October 31, 1968. The court changed the temporary restraining order into a preliminary injunction directing National to taxi with at least three men until the procedures of the Act are exhausted. 303 F.Supp. 1132.

*quo*," Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344, and "*no self-help is permitted.*" Brotherhood of Railroad Trainmen v. Akron & B.B.R. Co., 1967, 128 U.S.App. D.C., 59, 385 F.2d 581, 597. "[T]he parties may not * * * have resort to either the strike or the lockout before the procedures provided by the Act have been exhausted and a strike or lockout during that period is illegal and forbidden by the Act." American Airlines, Inc. v. Air Line Pilots Ass'n, S.D.N.Y.1958, 169 F.Supp. 777, 789.

■ National argues that the *status quo* provisions of the Act are inapposite here because the change in the taxi crews constitutes only a "minor" dispute.[2] National points out that the men struck over the suspension of the three employees in New York who were suspended because they disputed the work change in the taxi crews at JFK by refusing an assignment to taxi an aircraft. Inasmuch as this minor dispute ultimately led to the discharge of the strikers, the argument continues, the *status quo* provisions of the Act, applicable only to major disputes, cannot be invoked to compel reinstatement. But it is undisputed that the "major dispute" procedures of the Act were brought into play by the exchange of § 6 notices on October 31, 1968 and that those procedures had not been exhausted on January 21, 1969 when the strikers were discharged. Consequently, the discharge occurred during a "freeze" period when self-help is ordinarily unlawful. This would be true even if (and we need not decide the issue) the change in the taxi crews constituted a minor dispute: Plainly a carrier may not, under the guise of resolving a minor dispute, circumvent and defeat the statutory proscription on self-help while a major dispute is running its course. Cf. Brotherhood of Railway and Steamship Clerks,

Freight Handlers, Exp. and Station Emp., A.F.L.-C.I.O. v. Florida East Coast Ry. Co., 1966, 384 U.S. 238, 247, 86 S.Ct. 1420, 1425, 16 L.Ed.2d 501. The statutory ban on self-help is apposite: The question is whether this change violated the *status quo*.

The Union maintains that the discharge of the striking employees constitutes a permanent change in the *status quo*, thereby truncating the purpose of the Railway Labor Act. It argues that the district court abused its discretion and departed from its limited role as guardian of the *status quo* by including a provision in the January 20 order that strikers who refused to return to work "are subject to penalties which could include dismissal by NATIONAL AIRLINES." The Union stresses the impropriety and inflammatory effect of National's January 20 notice to the strikers that they would be discharged if they failed to return to work the next day. It emphasizes that the Union, not the carrier, was ordered to notify the strikers of the court's order. This "anticipatory discharge" or "constructive lockout" was thus a breach of National's obligation under the Act. Moreover, the Union further argues, the exercise of self-help by the strikers did not automatically create a right of self-help for the carrier. When the employees failed to return to work on January 21 under the second order of the court, the carrier was not thereby relieved of its obligation to maintain the *status quo*. Instead of resorting to self-help by terminating the strikers, National should have sought further aid from the district court. Consequently, the discharged strikers are entitled to reinstatement. ·

■■ Weighing against the Union's claim, however, is the undisputed illegality of the strike. A strike called before completion of the major dispute procedures, like a change made by the carrier, is unlawful and may be enjoined

---

2. *See* Elgin, Joliet and Eastern R. Co. v. Burley, 1945, 325 U.S. 711, 722–724, 65 S.Ct. 1282, 1289–1290, 89 L.Ed. 1886; Missouri-Illinois R. Co. v. *Order of Rail-* way Conductors, 8th Cir. 1963, 322 F.2d 793, 795 on the distinction between major and minor disputes.

pending compliance with the Act. Missouri-Illinois R. Co. v. Order of Ry. Conductors, 8 Cir. 1963, 322 F.2d 793, 796; American Airlines, Inc. v. Airlines Pilots Ass'n, S.D.N.Y.1958, 169 F.Supp. 777, 787. It seems established that "the Union may strike only if it has complied with the Act." United Industrial Workers of the Seafarers Int'l Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Marine Allied Workers Division, A.F.L.-C.I.O. v. Board of Trustees of Galveston Wharves, 5th Cir. 1968, 400 F.2d 320, 334; see Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 388, 390.[3] The Union here has consistently maintained that the strike was unlawful, and, with the exception of its objection to the language pertaining to discharge contained in the second order issued by the court, concedes the propriety of injunctive relief to end the strike.[4] National takes the position that an employer may, without more, lawfully discharge

---

3. The *status quo* provisions of the Railway Labor Act refer to the "representatives of the employees," § 6, or the "parties to the controversy," § 10, so that it is conceivable that only Union-sponsored strikes violate the Act. Such a literal analysis has not been applied, however, in construing other aspects of the Railway Labor Act, *see, e. g.*, Brotherhood of Railroad Trainmen v. Chicago River and Indiana R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, and it would hardly serve the purpose of the Act to hold that wildcat strikes, such as the strike involved here, did not come within the statutory ban on self-help. Moreover, it should be noted that § 2 of the Act provides that "it shall be the duty of * * * employees to exert every reasonable effort to make and maintain agreements * * * and to settle all disputes * * * in order to avoid any interruption to commerce or to the operation of any carrier * * *."

In this connection, consider: "On February 17, 1961 the flight engineers who were employed by Western Air Lines failed to show up for work. The Union says there was no Union sponsored strike. If there was no strike, the court is compelled to the conclusion that the flight engineers individually each of them simply quit their jobs." Flight Engineers v. Western Air Lines, S.D.Cal., April 14, 1961, 48 LRRM 2487; *see also* Wes Chapter, Flight Engineers' Int'l Ass'n A.F.L.-C.I.O. v. National Mediation Board, 1962, 114 U.S.App.D.C. 229, 314 F.2d 234, 237.

4. We take the case as we find it. The illegality of National's conduct with regard to the taxi dispute, see note 1, *supra*, was not advanced as a basis for denying an injunction against the strike. We therefore do not consider whether the equitable doctrine of "unclean hands," *see* Florida East Coast Ry. Co. v. Brotherhood of Locomotive Engineers, 5th Cir. 1966, 362 F.2d 482, 485, or the statutory enactment of that doctrine embodied in § 8 of the Norris-LaGuardia Act, 29 U.S.C. § 108, *see* Butte, Anaconda & Pac. Ry. Co. v. Brotherhood of Locomotive Firemen, 9th Cir. 1959, 268 F.2d 54, 60, cert. denied Butte, A. & P. Ry. Co. v. Anaconda Co., 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104, could have barred National's request for a strike injunction.

In this connection, consider the following:

"This was at a time when the Carrier itself was in violation of the Railway Labor Act. The cases suggest that at that time, under the Act, the Union had the right to strike; that right continues until the Act is complied with by the Carrier, and thereafter ceases during and until exhaustion of the procedures set up by the Act. * * * If the Carrier refuses to follow the procedures of the Act * * * the Union may strike."

United Industrial Workers of the Seafarers Int'l Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Marine Allied Workers Division, A.F.L.-C.I.O. v. Board of Trustees of Galveston Wharves, 5th Cir. 1968, 400 F.2d 320, 332–334. Under this rationale, it is conceivable that the strike at the time of the first hearing was lawful. The Union, however, did not contest the initial strike injunction. In any event, the Carrier promptly complied with the January 18 temporary restraining order, issued contemporaneously with the strike injunction, and was thereafter in compliance with the Act. The strike, however, continued and was, therefore, even under the *Galveston Wharves* rationale, in violation of the Act and properly enjoinable from that point forward, if not before. Thus there would have been no bar to the issuance of the second injunction issued on January 20.

employees engaged in an unlawful or a wildcat strike and that the strikers therefore are not entitled to reinstatement. This position finds substantial support in decisions entered in analogous situations under the National Labor Relations Act. It is generally held that, under the NLRA, an employer may lawfully discharge employees who engage in "unprotected" conduct or conduct directly violative of the Act and that the discharged employees may not invoke the Act to compel reinstatement by the employer.[5] It is reasoned that "in the absence of the statute, there was nothing in the law which forbade the discharge of strikers. There is nothing in the statute, properly construed, which protects from discharge those who strike in defiance of its provisions." N. L. R. B. v. Draper Corp., 4th Cir. 1944, 145 F.2d 199, 205, 156 A.L.R. 989. "The conduct thus protected is lawful conduct." N. L. R. B. v. Fansteel Metallurgical Corp., supra, 306 U.S. 255, 59 S.Ct. at 496. These principles, developed under the NLRA, National argues, are apposite here and justify the termination of the strikers.

Although the NLRA has been referred to for assistance in construing the Railway Labor Act, *see e. g.*, Steele v. Louisville & N. R. Co., 1944, 323 U.S. 192, 200–201, 65 S.Ct. 226, 231, 89 L.Ed. 173, we heed the Supreme Court's admonition that the former "cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., supra, 89 S.Ct. at 1118.[6]

■ Judge Wisdom succinctly stated the relevant differences:

[T]he Railway Labor Act is more concerned with *continuance of the employer's operations and the employer-employee relationship.* This is evidenced by the fact that while bargaining is the first and last step under the NLRA, it is only the first step under the Railway Labor Act in a ladder that leads to the White House if differences cannot be resolved. (Emphasis added)

United Industrial Workers of the Seafarers Int'l Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Marine Allied Workers Division, A.F.L.-C.I.O. v. Board of Trustees of Galveston Wharves, 5th Cir. 1968, 400 F.2d 320, 329–330. National's position fails to take into account the Railway Labor Act's explicit ban on self-help during the "freeze" imposed while the procedures of the Act run their course, a factor not present in the scheme established by the National Labor Relations Act. Self-help by the employees, as the Union correctly argues, does not automatically justify self-help by the carrier. "[R]esort to the courts is generally preferable to this kind of self-help * * * the 'cooling-off' policies of the major dispute procedures cannot be effectuated by allowing both parties simply to do away with the Act." Rutland Railway Corp. v. Brotherhood of Locomotive Engineers, 2d Cir. 1962, 307 F.2d 21, 45 (Marshall, J., dissenting). To allow the carrier to dis-

---

5. E. g., N.L.R.B. v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; National Packing Co. v. N.L.R.B., 10th Cir. 1965, 352 F.2d 482, 485 (unlawful picketing); Confectionery and Tobacco Drivers and Warehousemen's Union, Local 805, IBTCWHA v. N.L.R.B., 2d Cir. 1963, 312 F.2d 108, 112 (unlawful wildcat strike); N.L.R.B. v. Marshall Car Wheel and Foundry Co., 5th Cir. 1955, 218 F.2d 409, 413 (unprotected strike); Ohio Ferro-Alloys Corp. v. N.L.R.B., 6th Cir. 1954, 213 F.2d 646, 651.

6. "The relationship of labor and management in the railroad industry has developed on a pattern different from other industries. The fundamental premises and principles of the Railway Labor Act are not the same as those which form the basis of the National Labor Relations Act * * *." Brotherhood of Railroad Trainmen v. Chicago River and Indiana R. Co., 1957, 353 U.S. 30, 31, 77 S.Ct. 635, 636, 1 L.Ed.2d 622, n. 2.

charge all employees who strike in violation of the Railway Labor Act would undermine the Act's emphasis on "the continuance of the employer's operations and the employer-employee relationship." United Industrial Workers of the Seafarers Int'l Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Marine Allied Workers Division, A.F.L.-C.I.O. v. Board of Trustees of Galveston Wharves, *supra*. Under such a construction the carrier might be tempted to precipitate an unlawful strike in order to justify a massive discharge. Cf. Brotherhood of Railway and Steamship Clerks, Freight Handlers, Exp. and Station Emp., A.F.L.-C.I.O. v. Florida East Coast Ry. Co., *supra*, 384 U.S. at 247, 86 S.Ct. at 1425, 16 L.Ed.2d 501. We do not believe, therefore, that the illegality of the strike either relieved National of its duty to maintain the *status quo* or justified the discharge of the strikers.

Nonetheless, we hold that under the circumstances of this case, the resort to self-help by the carrier was not altogether prohibited by the Act. The strike, prompted by the suspensions of the three workers in New York, was spontaneous and unauthorized. Representatives of the Union stated at the first hearing that they were having difficulty returning the men to work. The first injunction, directing the Union to restore the *status quo* by ending the strike, proved ineffective. The strikers disregarded orders of their Union to return to work, and the carrier was already faced with the disruption of service at the time of the second hearing. At this point, it was apparent that the Union had lost control over the strikers. Contempt citations directed against the Union or its representatives, therefore, were less likely to end the strike.

In short, an unmanageable work stoppage had occurred and repeated attempts by the court, the carrier and the Union had failed to restore the *status quo* when the carrier resorted to self-help. Restoration of the *status quo* had been frustrated by a seemingly unmanageable strike. When viewed in this context, we cannot agree that the resort to self-help by the carrier would vitiate the *status quo* or subvert the orderly processes of the Act. A different case would be presented if there had appeared any substantial likelihood that the strike could have been brought to a prompt end by further court proceedings. But the resort to the courts having proven ineffective, the carrier was permitted to resort to self-help in order to operate its business. It has been held in other contexts that strike conditions may alter the carrier's statutory obligations to maintain agreements and preserve the *status quo*. Thus a carrier faced with a lawful strike over issues which have been carried through the procedures of the Act to an impasse may lawfully depart from other terms of the collective bargaining agreement without following the procedures of the Act, to the extent "reasonably necessary" to continue its operations. Brotherhood of Railway and Steamship Clerks, Freight Handlers, Exp. and Station Employees, A.F.L.-C.I.O. v. Florida East Coast Ry. Co., 1966, 384 U.S. 238, 248, 86 S.Ct. 1420, 1425, 16 L.Ed.2d 501; Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, AFL-CIO, 5th Cir. 1964, 336 F.2d 172, 182. The same principle is apposite here.

But the carrier's right to resort to self-help was not unlimited. Again, the principles developed in the *Florida East Coast* cases, *supra*, are applicable here. In those cases the courts defined the extent to which a carrier faced with a lawful strike is free to institute changes without complying with the procedures provided in § 6. The carrier's right to self-help, though explicitly recognized, was carefully circumscribed. The Supreme Court stated that "the justification for permitting the carrier to depart from the terms of the collective bargaining agreement *lies in its duty to continue to serve the public*." Brotherhood of Railway and Steamship Clerks, Freight Handlers, Exp. and Station Emp., A.F.L.-C.I.O. v. Florida East Coast Ry. Co., *supra*, 384 U.S. at 247, 86 S.Ct. at 1425,

16 L.Ed.2d 501, n. 8. (Emphasis added). Consequently, "while the carrier has the duty to make all reasonable efforts to continue its operations during a strike, its power to make new terms and conditions governing the new labor force is strictly confined, if the spirit of the Railway Labor Act is to be honored." *Id.* 384 U.S. at 247, 86 S.Ct. at 1425. As Judge Brown stated for this Court:

> [I]n order for the District Judge to allow FEC to escape the ban on institution of changes pending exhaustion of the statutory procedures recognized by the decisions, he must be convinced that in order to make a meaningful reality of FEC's right to continue to operate, the changes are reasonably necessary.

Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, AFL-CIO, 5th Cir. 1964, 336 F.2d 172, 182. We recognize that the courts were there dealing with the carrier's right to make necessary changes in response to a *lawful* strike whereas the present case involves the carrier's response to an *unlawful* strike. Thus it could be argued that the carrier's right to self-help is greater here. But the Act's primary emphasis on "the continuance of the employer's operations and the employer-employee relationship," United Industrial Workers of the Seafarers Int'l Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Marine Allied Workers Division, A.F.L.-C.I.O. v. Board of Trustees of Galveston Wharves, *supra,* is the same in either context and the resort to self-help by either side ought to be carefully circumscribed in both. We therefore hold that the carrier's resort to self-help was justified only to the extent necessary to restore service; its exercise was allowable only in so far as it served that end.

We do not think the mass discharge of the strikers in this case can be justified by the need to restore service. We recognize that the district court was faced with a difficult situation and had little time to deal with it. It is plain that the court's central concern was the restoration of the *status quo*. Nevertheless, we hold that the discharge of the strikers constituted an impermissible form of self-help. The discharge of the strikers was not necessary in order to hire a new labor force. Under both the NLRA and the Railway Labor Act, a carrier need not discharge those hired to replace strikers. E. g., N. L. R. B. v. Mackay Radio & Tel. Co., 1938, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381; Flight Engineers Int'l Ass'n, E.A.L. Chapter, A.F.L.-C.I.O. v. Eastern Air Lines, Inc., S.D.N.Y.1962, 208 F.Supp. 182, 194, aff'd 2 Cir., 307 F.2d 510. The hiring of replacements for the strikers would have been consistent with the attempt to restore service. The discharge of those best suited to carry on the carrier's business, on the other hand, would seem self-defeating: It prevented the possible restoration of the *status quo* should some or all of the strikers choose to return to work before enough replacements were hired. In this connection, we note that immediately after the discharge of the strikers, National notified the three men whose suspension had triggered the strike that they would be allowed to return to work on Friday, January 24, 1969, three days after the discharge of the strikers. It is possible that the strikers would have returned to work on Friday, January 24, when the three disciplined employees returned to work. The carrier's discharge of the strikers, therefore, may have foreclosed any opportunity to end the strike and restore the *status quo*.[7]

---

7. Additionally, we think National acted too hastily when it determined to discharge the strikers rather than returning to the district court for further advice. The court's order indicated only that the failure to return to work "could" subject the strikers to dismissal by National, not that it would do so. The primary responsibility for ending the strike rested in the district court: It was the court's responsibility and prerogative, not the carrier's, to compel compliance with the court orders. Before resorting to self-help, National should have sought authority from the court.

We think "it falls to the lot of the District Judge to pass on what changes were in fact necessary for [National] to continue to operate." Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, AFL-CIO, *supra*, 336 F.2d at 182. As indicated, replacement of the strikers, but not discharge, would seem compatible with the need to restore service. It follows that those strikers whose positions were filled either at the time of the discharge or before the time the strike would have run its course are *not* entitled to reinstatement. On the other hand, strikers for whom no replacements had been found when the strike probably would have ended *are* entitled to reinstatement from the time they would have returned to work. This will require a factual determination on remand of the point in time when the strikers would have returned to work, *e. g.*, the date the three suspended employees in New York returned to work. The strikers, who are in a better position to cast light on this issue, should carry the burden to show when they would have returned to work in the absence of the discharge. Strikers who had not been replaced at that time, as revealed by company records, are entitled to reinstatement.

In summary, we hold that the exercise of self-help by the carrier was not altogether barred by the Act. The holding is limited to the facts of this case. We emphasize: The unauthorized, or wildcat, nature of the strike; the repeated refusal of the strikers to restore the *status quo* in violation of the Act; the interruption of commerce; the professed absence of control by the Union over the strikers, thus diminishing the efficacy of fines or other contempt measures directed at the Union or its representatives; and the proven inability of the carrier, the Union, and the district court to return the strikers to work. We further hold, however, that the mass discharge of the strikers exceeded the permissible bounds of employer self-help under the circumstances. National was entitled only to hire replacements for the strikers in order to operate its airline. The dis-

trict court on remand should determine the precise extent to which the carrier exceeded the permissible bounds of self-help, as defined here, and determine the right of the strikers to reinstatement accordingly.

Reversed and remanded.