**NATIONAL AIRLINES, INC., Plaintiff,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS et al., Defendants.**

**No. 69–83–Civ–CA.**

United States District Court
S. D. Florida,
Miami Division.

Jan. 12, 1970.

---

William B. Killian, of Scott, McCarthy, Steel, Hector & Davis, Miami, Fla., for plaintiff.

Plato E. Papps, Gen. Counsel, International Association of Machinists and Aerospace Workers, and Joseph P. Manners, of Manners & Amoon, Miami, Fla., for defendant Union.

## ORDER ON MANDATE

ATKINS, District Judge.

This is a formal order entered in accordance with my oral ruling of December 23, 1969. That ruling was made pursuant to the opinion and mandate of the Fifth Circuit Court of Appeals entered September 23, 1969, and October 15, 1969, respectively (Docket No. 27312). The appellate decision reviewed and reversed action taken by this Court on January 24, 1969, in refusing to issue an injunction requiring National Airlines (hereinafter National) to reinstate illegally striking members of the International Association of Machinists and Aerospace Workers (hereinafter the Union) which the airline had discharged. The discharge was effected by a telegram sent by National on January 20 stating that the strikers would be terminated if they did not report back to work at their next scheduled shift beginning at 3:30 p. m. on January 21. The telegram was sent on the heels of the second injunction issued by this Court ordering the strikers to return to work. Neither the injunctions nor the telegram was effective. Further repetition of the facts seems unnecessary. They are unfortunately familiar to the many parties in this tragic labor dispute. For the sake of clarity the factual background of this case is set forth in the appellate opinion, National Airlines, Inc. v. International Association of Machinists and Aerospace Workers, et al., 5 Cir., 416 F.2d 998 at 1000–1001 and is herein incorporated by reference.

■ The duty given this Court on remand is succinctly expressed in the last sentence of the appellate opinion. "The district court on remand should determine the precise extent to which the carrier exceeded the permissible bounds of self-help, as defined here, and determine the right of the strikers to reinstatement accordingly." 416 F.2d at 1007. This statement must be viewed in the context of the entire opinion. The primary emphasis of the Railway Labor Act is, as stated in the opinion, "[the] continuance of the employer's operations and the employer-employee relationship." United Industrial Workers of the Seafarer's Int'l. Union of North America v. Board of Trustees of Galveston Wharves, 5th Cir. 1968, 400 F.2d 320, 329, 330. With this in mind the appellate court held that "the carrier's resort to

self-help was justified only to the extent necessary to restore service; its exercise was allowable only in so far as it served that end." 416 F.2d at 1006. The Court then found that it was not necessary for the airline to discharge the strikers in order to hire a new work force and that the airline had exercised an impermissible form of self-help in so doing. The court said that the airline should have replaced the strikers as it found new employees to do so. This court is charged in the opinion with determining when the strike would have ended had it not been for the illegal discharge. Once that time is established this court must then determine which strikers had been replaced at that time. Those strikers who had been replaced then would not be entitled to reinstatement.

On November 4, 1969 following issuance of the mandate, the Union filed a motion to reinstate the application for a preliminary injunction originally denied by this Court on January 24, 1969. This motion was accompanied by 937 substantially identical affidavits signed by discharged strikers stating that they would have returned to work at National on January 24, 1969.[1] The union also applied for relief on the mandate. Accordingly this court scheduled a series of conferences and hearings in order to receive evidence on the factual issues outlined above: The extent to which National exceeded the bounds of self-help; the time at which the strike would have ended; and what strikers had been replaced at that time.

Through the commendable efforts of all counsel the great bulk of the evidence has been presented by stipulation. This exhibition of professionalism dramatically shortened the time required to try the factual issues.

I find as follows with regard to these issues.

The catalyst which initiated the strike was the January 17, 1969 suspension of three union members for their failure to carry out a work assignment. Although speculative, the evidence shows, and I find that, in the absence of the discharge, the strike would have ended

---

1. The following is a sample affidavit:

**AFFIDAVIT**

STATE OF FLORIDA
COUNTY OF DADE

BEFORE ME, the undersigned authority, personally appeared _____,
                                                          (print name)
who, after being first duly sworn, on oath, deposes and states as follows:

1. That prior to my discharge and/or termination by National Airlines, Inc., I was employed as a _____, at the hourly rate of $_____. My average weekly
            (print job title)
earnings for a six month period prior to my termination, including overtime pay, was approximately $_____.

2. I was discharged and/or terminated on the _____ day of _____, 1969, and at that time I was working on the _____ shift. My Employee Number was _____.

3. That on or about January 17, 1969, when the sit-down began, I did join my brothers in supporting the three brothers who were suspended in New York. After being ordered off the premises of National Airlines, I had been advised by the Union to return for work but my position was always the same and that was that I would only return to work when my three brothers in New York were returned to work.

4. On January 24, 1969 I was aware that the Union was asking Judge Atkins for a ruling to undo the discharges and/or terminations so that we could all go back to work, as my three brothers in New York had been finally notified by the Company to return back to work on that date. I wanted to go back to work on that date and join them. I was denied this opportunity and have been denied this opportunity to this date.

FURTHER AFFIANT SAYETH NOT.

(JURAT OMITTED)

on January 24 when the suspension expired. This conclusion presupposes that the strikers would have been willing to return with no guarantee concerning pay and other benefits lost during their 7 day absence. Dealing in the abstract I cannot find that this supposition is a fact however it does seem reasonable.

As it happened, the strikers did not return on the 24th because they had been discharged. The three men who had been suspended did not return on the 24th either, as the Fifth Circuit erroneously assumed. 416 F.2d at 1006, 1007. I do not find that this factual error affects this aspect of the case on remand. The purpose of the strike was to secure for the three men the right to return to work. This was accomplished by the expiration of the suspension. Whether the three men actually physically returned to work at that time would seem irrelevant to the conclusion of the strike.

Next to be determined is the question of which strikers had been replaced as of January 24, 1969. I find that on January 24 National had four new men on its premises who had been hired to replace strikers. I further find that on that date National had approved and extended offers of employment to 63 replacements which had been accepted by the applicants. These 63 men were not, however, working for National on the 24th. The issue thus becomes whether an offer of employment to a new man constitutes replacement of a former employee. Do the 63 offers mean that 63 "positions were filled"? 416 F.2d at 1007. I find that, in the circumstances, the offers did constitute replacement. The majority of the offers were made to men from outside the State of Florida who had to return home and prepare to move in order to begin work. The offers were consistent with the airline's efforts to maintain service. Once National made these offers it had a commitment to honor. It had accepted the applicants' offer to work in classic contract terms. Therefore, on January 24 I find that 67 strikers had been replaced by National.

There remains for determination the most significant issue, to what extent did National exceed the permissible bounds of self-help? The appellate court specifically held that the mass discharge of the illegal strikers was not permissible, "under the circumstances." I find from the evidence adduced since the remand that these "circumstances" are not as the Fifth Circuit perceived.

In its opinion the appellate court quoted the Supreme Court as follows: "the justification for permitting the carrier to depart from the terms of the collective bargaining agreement lies in its duty to continue to serve the public." Brotherhood of Railway and Steamship Clerks, Freight Handlers, Exp. and Station Emp., A.F.L.-C.I.O. v. Florida East Coast Ry. Co., 384 U.S. 238 at 247, 86 S.Ct. 1420, at 1425, 16 L.Ed.2d 501. This principle was elaborated upon by Judge Brown in Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, A.F.L.-C.I.O., 5th Cir. 1964, 336 F.2d 172, 182. He again emphasized that a carrier's right to abrogate the status quo during a time of contract negotiation depends on the carrier's need to institute changes in order to continue operation. In the instant case of course contract negotiations were underway; Section 6 notices had been exchanged and both sides had an obligation to preserve the status quo. National's departure from the status quo by virtue of its mass discharge was made in an attempt to continue operations. Hindsight illustrates that this attempt was successful.

The reason for my decision that the strikers are not entitled to reinstatement lies in my finding from the undisputed evidence developed on the record, since remand, that in order to hire a new work force it was necessary for National to discharge all of the strikers. This evidence contradicts the language used by the Fifth Circuit in their opinion when they said "the discharge of the strikers was not necessary in order to hire a new labor force." This conclusion, upon which the court's later hold-

ing that "the mass discharge * * * exceeded the permissible bounds of employer self-help" is based, is not supported by the present record. It is now clear that in order to replace the illegally striking men National had to offer prospective employees seniority benefits and working conditions which would not be available if there was the prospect of a mixture of old and new men. National was hiring new men all over the United States. It is a fact that few of these men would have made the move to Miami without the guarantee of a solid seniority position and freedom from harassment by fellow workers.

The next question is then, was it necessary for National to hire a new work force "in order to make a meaningful reality of its right to continue to operate"? Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, A.F.L.-C.I.O., *supra*, 336 F.2d at 182. The answer is obvious. Without men to service its airplanes the company would have been forced to shut down. With supervisory personnel carrying the load the airline had cancelled 36 flights by the 3rd day of the strike and would have been forced to shut down within a very few days. The new men enabled the company to continue operations and within a month from that time 90% of the scheduled flights were operating. I recognize the appeal of the Fifth Circuit's statement that "the discharge of those best suited to carry on the carrier's business * * * would seem self defeating." However, it must be remembered that those "best suited" individuals refused to work. Considering the circumstances when they were discharged, National had no way to know when they would deign to return to work absent capitulation to their demands by the company. As this court abstractly found, the strikers would have most likely returned when the suspension of the three men was lifted. Can this

court, or the appellate court, then say that the only way in which National could exercise its right and duty to operate an airline and serve the public in the face of an illegal strike was to satisfy the demands of the illegal strikers? This conclusion would be a perversion of the Railway Labor Act.

The emphasis of the Act is on an orderly, prescribed procedure. The airline (and the union)[2] followed this procedure and twice came before this Court in attempting to maintain operations. Twice this court declared the strike illegal, with the assent of the union leadership, and twice this court issued an injunction requiring the men to return to work. These injunctions were totally ignored. The seriousness with which the strikers took their responsibilities under the law is illustrated by the testimony of Messrs. Exum, Ober, Ballas and Brown before this court on December 3, 1969. There was no further procedure prescribed by the Railway Labor Act which the airline could have invoked. Here I find relevant the following portions of the oft quoted Florida East Coast Ry. Co. v. Brotherhood of Railroad Trainmen, A.F.L.-C.I.O., *supra* at 181:

"Indeed, the unquestioned right to resort to self-help is the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration. * * *

"Since the right surely exists, the law must acommodate itself to the exercise of this power in a way that will make it effectual. Brotherhood of Railroad Trainmen v. Chicago R. & I.R.R., 1957, 353 U.S. 30, 40, 77 S.Ct. 635, 1 L.Ed.2d 622. Anything less either temporizes with the so-far-determined policy against compulsory arbitration, or puts the full weight of law on the side of the employees by making it impossible for the Railroad

2. It will be remembered that this court found National violated the status quo by changing the airplane taxi crew complement and that appropriate injunctive re-

lief was afforded the Union at their request. This injunction is honored to this day.

to carry on save on the terms and conditions imposed by the organized employees who now refuse to perform as agreed.

" * * * But when the machinery of industrial peace fails, the policy in all national labor legislation is to let loose the full economic power of each. On the side of labor, it is the cherished right to strike. On management, the right to operate, or at least the right to try to operate."

The Fifth Circuit noted the relevance of this FEC case in its opinion in this case and the analogy between the two is clear.

In conclusion, this Court has often been reminded that it sits as a court of equity while passing on the many requests for injunctions in this case. There are hundreds of wives and children of strikers caught up in this dispute to whom the word equity is non-existent. These persons are the victims of circumstances beyond their control. But the strikers were not such victims although some were permitted to believe that the three men had been fired rather than suspended. They chose their course— disregard for court orders, disregard for their job except under their conditions.[3]

The balancing of the equities is between these men and the airline. True, the mass discharge was swift but the strike took place in the heart of the company's busiest time—the tourist season. The little noted words of a distinguished brother judge, the late Alexander Holtzoff, are compelling here. In issuing an injunction restraining an unlawful strike in a Railway Labor Act case he said:

Any employee who without lawful excuse fails to appear for work runs the risk of having such failure properly treated by his employer, either as a tender of resignation or as a ground for discharge. In re Certain Carriers, Etc., 229 F.Supp. 259 at 261 (D.C. D.C., 1964).

If this principle is to be disregarded why are there laws defining the legality of strikes? If workers can strike at will no framework is needed. I hold that the principle is not to be disregarded and reiterate in accordance with the framework of the Railway Labor Act, that, faced with an illegal strike, National's departure from the terms of its collective bargaining agreement with the Union, to wit, the mass discharge was justified as it was reasonably necessary to allow the airline to assemble a new work force and thereby continue operation. Accordingly the Union's motion for an injunction requiring National to reinstate those strikers who have not returned to their jobs is denied.

---

3. It must be noted that 226 strikers have voluntarily returned to their jobs at National as of this date.