EASTERN AIR LINES, INC., Plaintiff,

v.

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, and Eastern Master Executive Council, Defendants.

No. 89–1630–Civ.

United States District Court, S.D. Florida.

Aug. 2, 1990.

David L. Ross, Alan H. Rolnick, Miami, Fla., for plaintiff Eastern Air Lines, Inc.

Robert T. Kaufman, Miami, Fla., James L. Linsey, New York City, for defendant Air Line Pilots Ass'n, Intern.

ORDER

EDWARD B. DAVIS, District Judge.

THIS MATTER is before the court on the following Motions:

(1) AIR LINE PILOTS ASSOCIATION, INTERNATIONAL's ("ALPA") Motion for Preliminary Injunctive Relief under Count I of ALPA's Counterclaims;

(2) ALPA's Motion for Summary Judgment; and

(3) EASTERN AIR LINES, INC.'s Motion for Summary Judgment.

I. BACKGROUND

The facts material to the issue presently before the court are largely undisputed. On March 4, 1989, after fully exhausting the dispute resolution mechanisms of the Railway Labor Act [1] ("RLA") the International Association of Machinists and Aerospace Workers, AFL–CIO ("IAM") commenced a strike against Eastern Air Lines, Inc. ("EASTERN"). On that same day, the AIR LINE PILOTS ASSOCIATION, INTERNATIONAL ("ALPA"), by vote of its Master Executive Council, honored the

1. 45 U.S.C. §§ 151–188 (1982).

IAM's picket lines. In an action before this court, ALPA's strike was held to be a lawful sympathy strike. *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Intern.*, 710 F.Supp. 1342 (S.D.Fla.), *aff'd*, No. 89–5229 (11th Cir. June 7, 1989).

During the ALPA strike, EASTERN hired new pilot recruits to fill pilot positions left vacant because of the strike. Under Federal Aviation Administration ("FAA") guidelines, trainee pilots must complete a series of FAA examinations, obtain an FAA pilot certificate, and secure a release from the FAA before operating EASTERN aircraft on regular revenue flights. Each new hire pilot, irrespective of level of experience, is required under these guidelines to complete training successfully before flying regular revenue flights. Under EASTERN's own regulations, pilot trainees and current pilot employees must undergo periodic training to familiarize themselves with specific EASTERN procedures and aircraft type. In order to meet the above requirements, EASTERN's new hire pilots were placed in a six to eight-week EASTERN training program. The program generally includes ground school instruction, flight simulator training, and the completion of training flights under the direction of EASTERN and/or FAA flight instructors.

By the middle of August 1989, several striking ALPA pilots had made individual unconditional offers to return to work for EASTERN. On or about August 11, 1989, EASTERN announced that EASTERN pilot positions were no longer available to former strikers and that former strikers wishing to return to work would be placed on inactive status on a preferential recall list for future pilot positions that might become available. At this point, approximately 800 new hire replacement pilots were still in training. On November 22, 1989, ALPA informed EASTERN of its unconditional termination of the pilot strike and that all former strikers were immediately and unconditionally available to return to work. By this date, approximately 250 new hire replacement pilots remained in training. From at least early August to the present date, EASTERN has filled va-

cant pilot positions from the ranks of its new hire pilots rather than from the ALPA pilots who had unconditionally offered to return to service.

On August 11, 1989, EASTERN filed this declaratory judgment action. ALPA has counterclaimed for injunctive and declaratory relief. It is undisputed in this lawsuit that replacement pilots who had actually begun flying regular revenue flights before ALPA pilots made their unconditional offers to return to work may be accorded permanent replacement status, and need not be displaced to create positions for returning strikers. Thus, both parties agree that the only issue to be determined at this juncture is the reinstatement rights of the returning strikers vis-a-vis those new hire pilots who were still in training, and who had not yet begun flying regular revenue flights ("trainees") when the ALPA pilots made unconditional offers to return to work.

## II. DISCUSSION

ALPA now moves for summary judgment as to EASTERN's claims and for a Preliminary Injunction under Count I of its Counterclaim. EASTERN has filed a Cross Motion for Summary Judgment on its Complaint for Declaratory Relief.

## A. SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the burden of demonstrating that there exists no genuine dispute as to any material fact. FED.R.CIV.P. 56(c) and (e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). All reasonable doubts as to the facts are to be resolved in favor of the party opposing summary judgment. *Mercantile Bank & Trust v. Fidelity Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985). While the burden on a party seeking summary judgment is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. As stated at the outset, the facts in

the instant dispute are largely undisputed, and both parties have filed Motions for Summary Judgment.

## B. THE RAILWAY LABOR ACT

■ Within the jurisprudence of reinstatement rights under the National Labor Relations Act ("NLRA"), an employer's refusal to reinstate former strikers constitutes an unfair labor practice, unless the employer can show that his action is supported by a legitimate and substantial business justification. *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967); *NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967). As first illustrated by the Supreme Court in *NLRB v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938), one such justification arises when, in an economic strike, returning strikers' jobs have been filled by workers hired as permanent replacements during the strike in order for the employer to continue operations. *Fleetwood Trailer*, 389 U.S. at 379, 88 S.Ct. at 546. In such cases, it is routinely held that an employer is not bound to discharge the permanent replacements in order to make room for returning strikers. *See, e.g., Belknap, Inc. v. Hale*, 463 U.S. 491, 500, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983); *Fleetwood Trailer*, 389 U.S. at 378, 88 S.Ct. at 545; *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 232, 83 S.Ct. 1139, 1147, 10 L.Ed.2d 308 (1963); *Mackay*, 304 U.S. at 345–47, 58 S.Ct. at 910–11. In short, the employer's interest in continuing operations is "deemed to outweigh the damage to concerted activities caused by permanently replacing strikers." *Erie Resistor*, 373 U.S. at 232, 83 S.Ct. at 1147. While the burden of proving that the replacements were hired as permanent employees falls square-ly on the shoulders of the employer, *Fleetwood Trailer*, 389 U.S. at 378, 88 S.Ct. at 545, the law allows for a considerable degree of contingency in the replacements' employment contract. *See Belknap*, 463 U.S. at 502–04, 103 S.Ct. at 3178–80.

Moreover, the issue of reinstatement rights has focused on the rights of the returning strikers, not on the rights or degree of protection afforded to the replacement workers.[2] Under *Belknap*, the rights of the replacement employees are enforceable even if antithetical to the rights of the returning strikers. A corollary follows: the rights of the replacement employees do not determine whether the employer has an obligation to reinstate past strikers.[3]

Although the principles discussed above arose under the National Labor Relations Act, courts have uniformly held that the general rule of *Mackay* applies with equal force in cases arising under the Railway Labor Act[4] ("RLA"). *See Trans World Airlines v. Independent Fed'n of Flight Attendants*, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989); *National Airlines, Inc. v. International Ass'n of Machinists & Aerospace Workers*, 416 F.2d 998 (5th Cir.1969), *appeal after remand*, 430 F.2d 957 (5th Cir.1970). In *Trans World Airlines*, supra, the Supreme Court recently approved the borrowing of precedent developed under the NLRA in order to aid the analysis of reinstatement rights under the RLA. The Court borrowed extensively from common law developed under the NLRA, but cautioned that because of the differing policies inherent in the two Acts, NLRA principles "cannot be imported wholesale into the railway labor arena." *Id.*, 109 S.Ct. at 1233 (quoting *Brotherhood of R.R. Trainmen v. Jacksonville Termi-*

---

**2.** As will be more fully developed in Part II.C., *post*, the inquiry as to whether the replacements are permanent is relevant not to determine the replacements' entitlement, but to determine the existence of a legitimate and substantial business justification.

**3.** Again, the status of the replacements *is* relevant for the purpose of determining whether an

employers' decision not to reinstate returning strikers is justified. *See supra* note 2. Here, as ALPA admits, EASTERN might be liable in contract to the replacements, irrespective of whether they are covered by the RLA.

**4.** 45 U.S.C. §§ 151–188 (1982).

*nal Co.,* 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969)).

In the context of the RLA, the former Fifth Circuit,[5] after recognizing the common carrier's duty to make all reasonable efforts to continue its operations during a strike, held the hiring of permanent replacements to be consistent with the attempt to restore service. *National Airlines, Inc. v. International Ass'n for Machinists and Aerospace Workers,* 416 F.2d 998, 1006 (5th Cir.1969) *("National I")*. In its opinion after remand, the Fifth Circuit provided guidance in identifying replacement workers, noting as critical the time when arrangements with the replacement workers become fixed and irrevocable:

> Thus, if an employer has the intention to bind itself to a firm contract of employment, and the employee has accepted a specific job assignment, the replacement is 'hired' even though subsequently he may be divested of the job for failure to pass medical or security clearance.

*National Airlines, Inc. v. International Ass'n of Machinists and Aerospace Workers,* 430 F.2d 957, 961 (5th Cir.1970) *("National II"),* cert. denied, 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971). The court went on to stress, however, that a mere offer and acceptance is not always enough. The court also found important "the necessity of actually coming on the payroll" and the commencement of actual employment. In remanding the issue to the district court for further factual determinations as to whether the strikers had been replaced, the court concluded that "[i]n the present case, the formation of an employment contract with a replacement, which never ripens into actual employment, may not displace the statutory right of the discharged employee to return to the status quo." *Id.* Thus, *National II* teaches that something more than an employment contract between the employer and replacement employee must exist before the striking employee's status is supplanted. Whether participating in a training program constitutes that "something more" is the question now before this court.

## C. STRIKERS OR TRAINEES?

■ No authority binding on this court has directly addressed the issue of whether replacements still in training at the time a strike is called off may be accorded permanent replacement status. The United States Court of Appeals for the Eighth Circuit, however, has answered that question in the negative. *Independent Fed'n of Flight Attendants v. Trans World Airlines,* 819 F.2d 839 (8th Cir.1987), *rev'd on other grounds,* 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) *("Flight Attendants")*.[6] In *Flight Attendants,* the Eighth Circuit held that replacement personnel (flight attendants) who had not completed training prior to the end of an IFFA strike could not be accorded permanent replacement status under the RLA.[7] *Id.* In arriving at this conclusion, the court observed that "RLA coverage is determined by the *work the person performs* under supervision of the employer." *Id.* at 846; *accord Air Line Pilots Ass'n v. United Airlines,* 802 F.2d 886, 913 (7th Cir.1986) ("unless a person has performed services for the employer under that employer's supervision he is not an employee for purposes of the RLA"), *cert. denied,* 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

To the extent that the pilot trainees in the instant case had not performed the work ordinarily discharged by the striking pilots, the trainees were not employees protected by the RLA. Trainees, to be sure, are not qualified to perform in the stead of the striking pilots. In fact, they may never be. Optimistically, they *may* ultimately fill

---

**5.** The Eleventh Circuit adopted as binding all decisions of the former Fifth Circuit handed down by October 1, 1981. *Bonner v. City of Prichard, Ala.,* 661 F.2d 1206 (11th Cir.1981).

**6.** The Supreme Court granted certiorari on an issue regarding the status of cross-over employees, but did not address the issue of replacement trainees. *Trans World Airlines v. Independent*

*Federation of Flight Attendants,* 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989).

**7.** The RLA provides coverage to "every air pilot or other person who performs any work as an employee or subordinate official of such carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service." 45 U.S.C. § 181.

the shoes of the striking employees. It would be presumptuous and premature, therefore, to afford trainees permanent replacement status which would otherwise permit EASTERN to keep them in its employ notwithstanding the termination of the strike. As the Eighth Circuit has remarked:

> [T]o amass a trainee pool capable of replacing the entire striking workforce at some future date after the strike has ended ... is inconsistent with the RLA's grant of protections to those persons who actually perform services for the employer.

*Flight Attendants*, 819 F.2d at 846.

That EASTERN trainees do not enjoy permanent replacement status under RLA is consistent with the balancing analysis germane to NLRA disputes. *See Mackay*, 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). The inquiry that has continuously controlled the issue of reinstatement rights under the *Mackay* rule is whether the failure to reinstate returning strikers is necessary for the continued operation of the business. If so, the action is deemed to be a legitimate and substantial business justification. *Fleetwood Trailer*, 389 U.S. at 378, 88 S.Ct. at 545. The need to continue employer's operations is particularly salient here, in light of the RLA's concern for the continued operation of this country's vital network of transportation industries.

While this court agrees that EASTERN had a legitimate and substantial business justification to replace striking pilots with replacement pilots who could promptly assume the requisite duties and responsibilities of striking pilots, the same does not hold true with regard to trainees. Hiring trained, qualified pilots is congruous with the undisputed purpose of the RLA: providing for uninterrupted transportation service, thereby maintaining the status quo.

Enlisting a fleet of unqualified trainees for potential future hiring needs, however, satisfies a concern significantly more remote. To be sure, trainees cannot fly revenue raising flights until they have completed the training program. Their utility to the airline is contingent upon becoming qualified for the position.[8] Thus, contracting with unqualified persons for future employment as pilots did not serve to fill the void left by the striking pilots, at least not until some later date.

And, the inquiry now is whether Eastern has a legitimate *and substantial* business justification for preferring unprepared trainees over striking pilots who have returned to work. In this vein, the Supreme Court has held that:

> In *some situations*, "legitimate and substantial business justifications" for refusing to reinstate striking employees who engaged in an economic strike, have been recognized. One is when the jobs claimed by the strikers are *occupied* by workers hired as permanent replacements during the strike in order to continue operations.

*Fleetwood Trailer*, 389 U.S. at 379, 88 S.Ct. at 546 (emphasis added). Thus, EASTERN has no legitimate business justification in choosing to employ trainees who have not yet occupied pilot positions, over unconditionally available, striking pilots, even if it has enforceable contractual obligations to the trainees. *Id.; cf. Belknap*, 463 U.S. at 512, 103 S.Ct. at 3184 (employer may be liable in contract to ousted replacement pilots, even though forced to reinstate strikers in an unfair labor practices dispute).

## III. CONCLUSION

That the striking pilots are entitled to displace trainees does not necessarily imply that Eastern acted unreasonably in cultivating a sizable training pool of potential

---

**8.** Although the former Fifth Circuit stated in *National II,* 430 F.2d at 961, that included among those "hired" as permanent replacements, are persons "subsequently ... divested of the job for failure to pass medical or security clearance," *ante* at 7, this court does not read that passage to mean that a trainee, unqualified for the position he is seeking, must be accorded permanent replacement status. Even if the court would accord such status to an otherwise qualified person when not able to meet medical or security clearance, that does not compel the same conclusion for a person inherently incapable of performing the job in question because of lack of skill and training.

pilots to assuage a future crisis. But this court must balance competing interests: the rights of striking pilots to return to their jobs against management's efforts to maintain the status quo throughout the strike. After careful consideration, this court concludes that the *Mackay* balance weighs in favor of reinstating the striking pilots in place of the trainees. Accordingly, it is hereby

ORDERED AND ADJUDGED as follows:

[1] that ALPA's Motion for Preliminary Injunctive Relief under Count I of ALPA's Counterclaims be GRANTED;

[2] that ALPA's Motion for Summary Judgment be GRANTED;

[3] that EASTERN AIR LINES, INC.'s Motion for Summary Judgment be DENIED.

DONE AND ORDERED.