920 F.2d 722
 136 L.R.R.M. (BNA) 2082, 59 USLW 2405,
117 Lab.Cas. P 10,465
 EASTERN AIR LINES, INC., Plaintiff-Counterclaim Defendant-Appellant,
v.
AIR LINE PILOTS ASSOCIATION INTERNATIONAL, Eastern Air Lines
Master Executive Council, Defendants-Counterclaim
Plaintiffs-Appellees.
 No. 90-5658.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 20, 1990.
 
 Joseph L. Manson, Washington, D.C., for plaintiff-counterclaim defendant-appellant.
 Robert T. Kofman, Miami, Fla., Russell Hollander, Cohen, Weiss and Simon, James L. Linsey, Stephen Presser, New York City, for defendants-counterclaim plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HATCHETT, and ANDERSON, Circuit Judges, and ESCHBACH*, Senior Circuit Judge.
 HATCHETT, Circuit Judge:
 
 
 1
 In this expedited case, we affirm the district court's ruling that Eastern Air Lines, Inc. (Eastern) is obligated under the Railway Labor Act to reinstate returning pilot-strikers prior to awarding pilot positions to new hire pilots who, at the time the pilot-strikers unconditionally offered to return to work, had not successfully completed Eastern's training program and had not started flying regular revenue flights.
 
 FACTS
 
 2
 On March 4, 1989, the International Association of Machinists and Aerospace Workers, AFL-CIO (IAM), which is the collective bargaining representative for mechanics and ground service employees at Eastern, initiated a strike against Eastern. On the same day, the Air Line Pilots Association, International (ALPA), which is the collective bargaining representative for Eastern's pilots, and the Eastern pilot group decided to honor the IAM's picket lines by engaging in a sympathy strike.
 
 
 3
 Shortly after the strike commenced, Eastern began hiring and training new pilots to fill vacant positions caused by the strike. For at least the first ten days of this hiring process, Eastern told prospective new hire pilots that they would become Eastern employees and assume permanent status upon completion of their training. Subsequently, Eastern informed new hire pilots that they would be considered permanent replacements for Eastern's striking pilots on the first day of training.
 
 
 4
 Eastern periodically entered the new recruits into the pilot training program which it administered under Federal Aviation Administration (FAA) guidelines. The training program lasted at least eight weeks (but in some cases took as long as four months), and included ground school instruction, oral and written examinations, and extensive use of sophisticated cockpit and flight simulators. See generally 14 C.F.R. Secs. 121.403-09, 121.424, 121.433 (1990). New hire pilots were also required to complete between ten to twenty-five hours of operating experience on the type of aircraft for which they had been trained. This operating experience, called Initial Operating Experience (IOE), must be performed on Eastern aircraft under the supervision of a "check pilot." See 14 C.F.R. Sec. 121.434 (1990). Under FAA requirements, Eastern's pilot trainees must pass: (1) an FAA-administered examination after completing ground school; (2) an FAA-administered simulator test; and (3) an FAA-administered check ride at the conclusion of IOE. If the trainee successfully completes each of these requirements, the FAA issues a certificate which permits the trainee to fly regular revenue flights under Eastern's supervision and authority.
 
 
 5
 By early August of 1989, many of Eastern's striking pilots had made unconditional offers to return to work. On August 11, 1989, Eastern publicly stated that no pilot positions were available to former strikers. Instead, Eastern announced that strikers wishing to return to work would be placed on inactive status on a preferential recall list for future pilot positions as they became available. As of August 11, 1989, a significant number of new hire replacement pilots were still in training.
 
 
 6
 On November 22, 1989, the ALPA terminated the pilot strike and notified Eastern that all former strikers were immediately and unconditionally available to return to work. As of that date, at least 227 new hire replacement pilots remained in training.[1] From at least early August, 1989, until August 2, 1990, when the district court granted ALPA's motion for a preliminary injunction, Eastern filled vacant pilot positions by giving preference to its new hire pilots, rather than Eastern's striking pilots who had unconditionally offered to return to service.
 
 PROCEDURAL HISTORY
 
 7
 On August 11, 1989, Eastern filed this action against ALPA seeking a declaratory judgment under the Railway Labor Act (RLA), 45 U.S.C. Secs. 151-188, declaring that its "new hire pilots in training are permanent replacements who may not be deprived of active employment by strikers who have offered to return to work but have not yet been reinstated." ALPA counterclaimed requesting injunctive, declaratory, and monetary relief under the RLA. By its counterclaim, ALPA sought to vindicate its rights and the rights of former strikers against "Eastern's refusal to reinstate former strikers to Eastern pilot positions by treating non-employee 'trainees' as permanent replacements." Both Eastern and ALPA filed motions for summary judgment. ALPA also moved for preliminary injunctive relief under Count I of its counterclaims.
 
 
 8
 The district court entered summary judgment for ALPA and denied Eastern's request for summary judgment. Further, the district court granted ALPA's motion for preliminary injunctive relief under Count I of its counterclaims, (1) enjoining Eastern from treating its trainees as permanent replacements, or awarding trainees pilot positions ahead of former striking pilots who unconditionally returned to work, (2) ordering reinstatement for each former striking pilot prior to awarding pilot positions to new hire pilots who remained trainees as of November 22, 1989, and (3) enjoining displacement of striking pilots by new hire pilots who remained trainees as of November 22, 1989. ALPA's motion for preliminary injunctive relief defined trainees as "new hire pilot recruits who have not completed new hire pilot training--including Initial Operating Experience training flights and the receipt of a final Federal Aviation Administration ... release to perform Eastern pilot services--and have not flown their initial, FAA-authorized Eastern revenue flight."
 
 CONTENTIONS
 
 9
 Eastern contends that the district court erroneously ruled that the RLA requires it to displace its newly hired trainee pilots and reinstate former striking pilots to available Eastern pilot positions. According to Eastern, its new hire pilots who were still in training when the strike ended, were permanent employees. Consequently, Eastern argues that under striker replacement law, the returning strikers are not entitled to displace these permanent replacement pilots. Further, Eastern contends that the district court's preliminary injunction is impermissibly vague. Fed.R.Civ.P. 65(d).
 
 
 10
 ALPA contends that the district court properly granted summary judgment because Eastern violated the RLA by refusing to reinstate returning strikers prior to awarding pilot positions to pilot trainees. Pilot trainees are not "permanent replacements" under the RLA, ALPA argues, until they fully complete training and operate their post-IOE initial revenue flight. Moreover, ALPA contends that the district court's preliminary injunction satisfies the requirements of Fed.R.Civ.P. 65(d).
 
 ISSUE
 
 11
 The sole issue in this case is whether the district court correctly determined that the RLA requires Eastern to reinstate former striking pilots prior to awarding pilot positions to new hire pilots in training.[2]
 
 DISCUSSION
 A. Standard of Review
 
 12
 Our review of the district court's grant of summary judgment "is plenary, and we must apply the same legal standards used by the district court." Fernandez v. Bankers National Life Ins. Co., 906 F.2d 559, 564 (11th Cir.1990). "We will affirm the district court if, after construing the evidence in the light most favorable to the nonmoving party, we find that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." William Penn Life Ins. Co. of New York v. Sands, 912 F.2d 1359, 1361 (11th Cir.1990). Further, we review the district court's grant of a preliminary injunction only for an abuse of discretion. Zardui-Quintana v. Richard, 768 F.2d 1213, 1216 (11th Cir.1985).
 
 
 13
 B. The Railway Labor Act and Reinstatement Rights
 
 
 14
 Under the RLA, airline employees remain statutory employees of the carrier during a strike unless they secure other work. See Independent Fed'n of Flight Attendants v. Trans World Airlines, Inc., 819 F.2d 839, 842 (8th Cir.1987) (Trans World ), rev'd on other grounds, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989); cf. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 378-79, 88 S.Ct. 543, 545-46, 19 L.Ed.2d 614 (1967) (Fleetwood Trailer ). Consequently, an employer's refusal to reinstate former strikers after an economic strike constitutes an unfair labor practice unless the employer can prove that the failure to reinstate is based upon "legitimate and substantial business justifications." See Fleetwood Trailer, 389 U.S. at 378-79, 88 S.Ct. at 546 (quoting NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967)).
 
 
 15
 Where, for instance, an employer hires permanent replacement employees during an economic strike to continue operations, and refuses to discharge the permanent replacements in order to make room for returning strikers, the Supreme Court has found the employer's decision to be supported by a legitimate and substantial business justification. See NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 345-46, 58 S.Ct. 904, 910-11, 82 L.Ed. 1381 (1938) (Mackay ); Fleetwood Trailer, 389 U.S. at 379, 88 S.Ct. at 546 (an employer has "legitimate and substantial business justifications" for refusal to reinstate when "the jobs claimed by the strikers are occupied by workers hired as permanent replacements during the strike in order to continue operations"); NLRB v. Erie Resistor Corp., 373 U.S. 221, 232, 83 S.Ct. 1139, 1147-48, 10 L.Ed.2d 308 (1963) (Erie Resistor ) (under Mackay, "an employer may operate his plant during a strike and at its conclusion need not discharge those who worked during the strike in order to make way for returning strikers."). Under these circumstances, the employer's legitimate interest in continuing operations is "deemed to outweigh the damage to concerted activities caused by permanently replacing strikers." Erie Resistor, 373 U.S. at 232, 83 S.Ct. at 1147. Although this exception, referred to as the Mackay exception, is firmly rooted in striker replacement doctrine, "[c]ourts have been reluctant to extend" it. Trans World, 819 F.2d at 846 (citing Erie Resistor, 373 U.S. at 232, 83 S.Ct. at 1147-48; International Ass'n of Machinists and Aerospace Workers v. J.L. Clark Co., 471 F.2d 694, 698 (7th Cir.1972)).[3]
 
 C. District Court's Ruling
 
 16
 The district court began its analysis by noting that "[n]o authority binding on this court has directly addressed the issue of whether replacements still in training at the time a strike is called off may be accorded permanent replacement status." The district court defined trainees as "new hire pilots who were still in training, and who had not yet begun flying regular revenue flights ... when the ALPA pilots made unconditional offers to return to work."
 
 
 17
 In the absence of binding authority, the district court followed Trans World, 819 F.2d at 845-47, cert. denied in rel. part, 485 U.S. 958, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988), and Air Line Pilots Ass'n, Intern. v. United Air Lines, Inc., 802 F.2d 886 (7th Cir.1986) (United Air Lines ), cert. denied, 480 U.S. 946, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987), and held that "[t]o the extent that the pilot trainees in the instant case had not performed the work ordinarily discharged by the striking pilots, the trainees were not employees protected by the RLA." Further, the district court found that although Eastern "had a legitimate and substantial business justification to replace striking pilots with replacement pilots who could promptly assume the requisite duties and responsibilities of striking pilots, the same does not hold true with regard to trainees." Based upon these findings, the district court concluded that "the Mackay balance weighs in favor of reinstating the striking pilots in place of the trainees."
 
 
 18
 In this court, Eastern argues that, contrary to the district court's conclusion, its trainee pilots are permanent replacement employees, and that it is not, therefore, obligated to reinstate returning strikers. According to Eastern, this case is controlled by National Airlines, Inc. v. International Ass'n of Machinists and Aerospace Workers, 416 F.2d 998 (5th Cir.1969) (National I ), appeal after remand, 430 F.2d 957 (5th Cir.1970) (National II ), cert. denied, 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971). In response, ALPA argues (1) that returning pilots are entitled to displace pilot trainees because the trainees are not yet "permanent employees" under the RLA, (2) that National I and National II are consistent with the district court's holding, and (3) that this court should follow the Eighth Circuit's holding in Trans World, and the Seventh Circuit's decision in United Air Lines.
 
 D. Analysis
 
 19
 In this case, it is undisputed that replacement pilots who had begun flying regular revenue flights before Eastern's striking pilots made their unconditional offers to return to work, may be accorded permanent replacement status under the Mackay exception, and are not to be displaced to create positions for returning strikers. At issue is whether Eastern is obligated, under the RLA, to reinstate returning pilots prior to awarding pilot positions to new hire pilots in training who had not (1) completed Eastern's training program and IOE, (2) obtained an FAA certificate, and (3) begun flying regular revenue flights under Eastern's supervision and authority.
 
 
 20
 We note at the outset that neither the Supreme Court nor this court has specifically addressed whether the RLA requires an employer to reinstate returning strikers before awarding permanent positions to new hire trainees, such as the trainee pilots involved in this case. The answer to this question turns on whether Eastern's trainees were "permanent replacements."[4]
 
 
 21
 1. Trainees, Trans World, and United Air Lines
 
 
 22
 The narrow Mackay exception does not apply in this case because Eastern's trainee pilots did not attain the status of permanent replacement employees. The RLA defines an "employee" as:
 
 
 23
 every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect....
 
 
 24
 45 U.S.C. Sec. 151, Fifth. Further, 45 U.S.C. Sec. 181 limits "employee" status and the scope of RLA protection to "every air pilot or other person who performs any work as an employee or subordinate official of [a] carrier or carriers, subject to its or their continuing authority to supervise and direct the manner of rendition of his service." (Emphasis added.)
 
 
 25
 In Trans World, the Eighth Circuit applied 45 U.S.C. Sec. 181 and held that, under the RLA, a carrier's new hire trainees who had not completed their training prior to the end of a strike were not permanent employees, and were subject to displacement by returning strikers. See Trans World, 819 F.2d at 845-46. The facts of Trans World are indistinguishable from those in this case. In Trans World, the carrier hired and trained large numbers of would-be permanent replacement employees to continue operations during a flight attendant strike. At the conclusion of the strike, approximately 463 of the new hires had not completed flight attendant training.
 
 
 26
 After the strike, the carrier gave the trainees permanent replacement status and job placement preference over returning strikers. As in this case, Trans World argued that its trainees constituted permanent replacements under the RLA because the carrier had told the trainees that they were permanent employees, and paid them a salary. The Eighth Circuit rejected the carrier's argument finding that "those flight attendants holding a trainee status at the end of the strike may not be retained over striking employees." Trans World, 819 F.2d at 842. As the court explained:
 
 
 27
 The trainees in question, although hired by TWA, never performed any services for TWA under its supervision prior to the Union's offer to return to work. Thus, they cannot be considered employees within the meaning of the RLA.
 
 
 28
 Trans World, 819 F.2d at 845-46. The Trans World court thus held that carriers cannot refuse to reinstate strikers by treating trainees as permanent replacements, and that carriers cannot reserve job positions for trainees once strikers unconditionally offer to return to work. Trans World, 819 F.2d at 845-47; see also Railway Labor Executives' Ass'n v. Wheeling Acquisition Corp., 736 F.Supp. 1397, 1403 (E.D.Va.1990) ("RLA rights are conferred only on 'employees' of a 'carrier' who currently perform work for that carrier.").
 
 
 29
 Similarly, in United Air Lines, the Seventh Circuit held that "unless a person has performed services for the employer under that employer's supervision he is not an employee for purposes of the RLA." United Air Lines, 802 F.2d at 913. In United Air Lines, the carrier recruited and began training some 500 pilots (the Group of 500) prior to the commencement of a pilot strike. United Air Lines offered 375 of these recruits, who had successfully completed their training, employment beginning on May 17, 1985, the day ALPA went on strike. All but a few of the Group of 500 honored ALPA's picket lines. In response, United Air Lines stated that it would not hire any member of the Group of 500 who had failed to report to work, except for cases involving personal hardship or other extenuating circumstances.
 
 
 30
 ALPA filed suit alleging that United Air Lines's actions with respect to the Group of 500 violated the RLA. The district court found for the Group of 500 concluding that they had become employees on May 17, 1985, the day the strike began, and that United Air Lines's treatment of these pilots after that date violated the RLA, 45 U.S.C. Sec. 152, Fourth. The Seventh Circuit reversed holding that the Group of 500 were not "employees" under the RLA entitled to the protections of 45 U.S.C. Sec. 152, Fourth. United Air Lines, 802 F.2d at 911 n. 17. The Seventh Circuit opined:
 
 
 31
 These pilots never performed any work for United nor did they ever submit to United's supervision of them in their work. By its own terms, the definition of employee under the RLA would exclude our giving the Group of 500 employee status.
 
 
 32
 United Air Lines, 802 F.2d at 911. The court went on to state that "trainees ... simply do not fall within the RLA's definition of employee." United Air Lines, 802 F.2d at 913.
 
 2. Eastern's Trainees
 
 33
 Based upon the persuasive reasoning in Trans World and United Air Lines, we hold that Eastern's new hire trainee pilots did not obtain the status of "permanent employees." First, the trainees were not qualified to perform the work Eastern's pilots ordinarily discharged. As previously stated, under FAA guidelines, Eastern's trainee pilots are required to complete a series of FAA examinations and obtain an FAA pilot certificate before operating on Eastern's regular revenue flights. To satisfy these requirements, Eastern enrolled its new-hire pilots in a training program which, in some cases, lasted as long as four months. Eastern's training program included ground school instruction, examinations, flight simulator training, and IOE.[5] Consequently, a trainee would only become qualified to fly regular revenue flights for Eastern when the trainee successfully completes the training program, passes the FAA examinations, obtains an FAA pilot certificate and secures a release from the FAA.
 
 
 34
 Second, Eastern's trainees were not actually performing the work ordinarily discharged by the former strikers. As the district court correctly reasoned:
 
 
 35
 Trainees, to be sure, are not qualified to perform in the stead of striking pilots. In fact, they may never be. Optimistically, they may ultimately fill the shoes of the striking employees. It would be presumptuous and premature, therefore, to afford trainees permanent replacement status which would otherwise permit Eastern to keep them in its employ notwithstanding the termination of the strike.
 
 
 36
 Eastern suggests that the distinction between trainees and returning strikers is an artificial one because the former strikers, like the trainees, must submit to training prior to again flying regular revenue flights. According to ALPA, "striking pilots can be requalified within a matter of days." Eastern maintains, however, that "having now been out of the cockpit for over 10 months, it would take a minimum of 10 days of training, to requalify a returning striker, provided that the pilot were returning to his or her prestrike category position," and assuming the pilot did not return to his or her prestrike category position, the process could take "up to 30 days." Our review of the record convinces us that the distinction between trainees and Eastern's returning pilots is real. First, the former strikers, unlike the trainees, have actually flown regular revenue flights for Eastern. Second, the returning pilots are only required to complete requalification training. Whether the duration of the requalification training is a "matter of days," ten days, or even thirty days, that period is substantially less than the time required to train and qualify the new hire pilots.
 
 
 37
 Despite the fact that Eastern's trainee pilots may never be qualified to fly regular revenue flights, Eastern argues that they are permanent employees because Eastern immediately placed the pilot trainees on its payroll, and gave them seniority numbers. We do not consider these unilateral actions to be dispositive of whether Eastern's trainees are permanent employees. As the Eight Circuit concluded in Trans World:
 
 
 38
 The RLA does not extend its coverage based upon the employer's labelling of persons as employees or the payment of salary. Rather, RLA coverage is determined by the work the person performs under supervision of the employer. This performance factor is determinative in trainee situations because it is the only requirement that the statute explicitly includes. Thus, clear statutory language supports the conclusion that the trainees are not employees protected by the RLA because these trainees were not "performing any work" of the carrier by any stretch of the imagination.
 
 
 39
 Trans World, 819 F.2d at 846 (emphasis in original).
 
 
 40
 Further, Eastern urges this court to disregard the Eighth Circuit's decision in Trans World and the Seventh Circuit's holding in United Air Lines because, according to Eastern, a new hire recruit need not attain "employee" status under the RLA to be deemed a permanent replacement. We reject Eastern's urgings. Acceptance of Eastern's analysis would result in the creation of two classes of common carrier employees; "permanent employees" entitled to the benefits and privileges of the RLA and bound by its duties and penalties, and a second class of "permanent employees" (the trainees) whose employer/employee relationship is not governed by the regulatory framework established by the RLA, and who are not extended the same benefits and obligations available to the other class of "permanent employees." No authority leads us to create such an anomalous situation.
 
 3. National I and National II
 
 41
 Eastern argues that National II is controlling and requires that we hold that its trainees are permanent replacements. In National I, the Fifth Circuit held that the carrier had exceeded the permissible bounds of self-help by discharging employees who had engaged in an unlawful wildcat strike; the carrier "was entitled only to hire replacements for the strikers in order to operate its airline." 416 F.2d at 1007. In reversing the district court, the Fifth Circuit held that, under the RLA, the carrier could only refuse to reinstate former strikers if the strikers' jobs had been "filled" by permanent replacements "either at the time of the discharge or before the time the strike would have run its course." National I, 416 F.2d at 1007. The Fifth Circuit remanded the case to the district court to determine the number of positions "filled" by replacements. On remand, the district court held that the carrier had "hired" sixty-seven replacements as of the date that the strikers would have returned to work. National Airlines, Inc. v. International Ass'n of Machinists, 308 F.Supp. 179, 182 (S.D.Fla.), rev'd, 430 F.2d 957 (5th Cir.1970), cert. denied, 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971).
 
 
 42
 The Fifth Circuit again reversed the district court, and remanded the case for a determination of the number of striking employees who had been "replaced" by new hire employees as of the date the strike would have ended. "In cases of replacement of a striker," the court concluded:
 
 
 43
 the critical time is when the arrangements with the replacement worker become fixed and irrevocable. Thus, if an employer has the intention to bind itself to a firm contract of employment, and the employee has accepted a specific job assignment, the replacement is "hired" even though subsequently he may be divested of the job for failure to pass medical or security clearance.
 
 
 44
 430 F.2d at 961 (citations omitted).
 
 
 45
 Although National I and National II are instructive, we do not agree with Eastern that these cases compel a reversal of the district court. First, in National II, the Fifth Circuit carefully noted that the critical time for determining when an employee is replaced is when the arrangements with the worker become "fixed and irrevocable." 430 F.2d at 961. In this case, although the new hires were on the payroll, as trainees their employment status could hardly be classified as "fixed and irrevocable" given that they could only fly regular revenue flights for Eastern if they successfully completed the training program and satisfied FAA requirements.
 
 
 46
 Second, National II did not, as does the present case, involve the employment status of trainees who could only work for the employer when they satisfactorily completed a lengthy training program and secured the requisite governmental releases and certificates. Nothing in National II permits carriers to refuse to reinstate former strikers by reserving available job positions for a significant period of time while a pool of unqualified trainees completes this process.
 
 
 47
 Third, we read the Fifth Circuit's dictum that a "replacement is 'hired' even though subsequently he may be divested of the job for failure to pass medical or security clearance" to mean that an employer can treat a new hire as a permanent replacement where, but for the failure to subsequently satisfy a technical qualification, the new hire would otherwise be considered a permanent employee. The prerequisites at issue in this case (i.e. satisfactory completion of Eastern's training program and compliance with the FAA's requirements) do not amount to technicalities which would allow Eastern, under National II 's reasoning, to treat a trainee as a permanent replacement prior to the trainee satisfying these job requirements. Consequently, we hold that the Mackay exception does not apply in this case because Eastern's trainees were not permanent replacements.
 
 4. RLA Policy
 
 48
 Our conclusion, that Eastern is required to reinstate returning pilots prior to awarding pilot positions to new hire pilots, is consistent with RLA policy. Eastern's decision to refuse to reinstate returning pilots while reserving available pilot positions for unqualified trainee pilots, did not promote one of the declared purposes of the RLA which is to "avoid any interruption to commerce or to the operation of any carrier." 45 U.S.C. Sec. 151a. As the district court reasoned:
 
 
 49
 Hiring trained, qualified pilots is congruous with the undisputed purpose of the RLA: providing for uninterrupted transportation service, thereby maintaining the status quo. Enlisting a fleet of unqualified trainees for potential future hiring needs, however, satisfies a concern significantly more remote. To be sure, trainees cannot fly revenue raising flights until they have completed the training program. Their utility to the airline is contingent upon becoming qualified for the position. Thus, contracting with unqualified persons for future employment as pilots did not serve to fill the void left by the striking pilots, at least not until some later date.
 
 
 50
 Further, we agree with the Eighth Circuit's observation in Trans World that:
 
 
 51
 to amass a trainee pool capable of replacing the entire striking workforce at some future date after the strike has ended ... is inconsistent with the RLA's grant of protections to those persons who actually perform services for the employer.
 
 
 52
 819 F.2d at 846.
 
 
 53
 Moreover, Eastern's treatment of the returning pilots strikes a fundamental blow to the union and the collective bargaining process. See Trans World, 489 U.S. at 442, 109 S.Ct. at 1235, 103 L.Ed.2d at 471 ("we should hesitate to imply limitations on all but those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself."). Not only does Eastern's decision to give preference to trainees over returning strikers discourage employees from exercising their rights to organize and to strike, it undermines one of the RLA's central goals: the preservation of the employer-employee relationship both during and after a strike. See Fleetwood Trailer, 389 U.S. at 378, 88 S.Ct. at 545-46; Empresa Ecuatoriana de Aviacion, S.A. v. District Lodge No. 100, 690 F.2d 838, 845 (11th Cir.1982), cert. dismissed, 463 U.S. 1250, 104 S.Ct. 40, 77 L.Ed.2d 1457 (1983).
 
 5. Preliminary Injunction
 
 54
 Finally, we find that the district court's preliminary injunction is not impermissibly vague. Rule 65(d) of the Federal Rules of Civil Procedure simply requires "that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is prescribed." See C. Wright and A. Miller, 11 Federal Practice and Procedure Sec. 2955 at 536-37 (1973 & Supp.1990); see also Williams v. City of Dothan, Ala., 818 F.2d 755, 761 (11th Cir.1987) ("As this court has noted, Rule 65(d) should not be applied strictly; rather the inquiry should be whether the parties subject to the injunctive order understood their obligations under the order."). Here, the district court's order clearly requires Eastern to reinstate the number of former strikers necessary to fill those pilot positions unlawfully reserved for trainees at the end of the strike. Because the district court has yet to determine the specific number of Eastern pilot positions covered by the preliminary injunction and other issues, we remand the case to the district court.
 
 CONCLUSION
 
 55
 For the foregoing reasons, we hold that the district court properly concluded that the RLA requires Eastern to reinstate returning strikers prior to awarding pilot positions to new hire pilots in training. We remand this case to the district court for further proceedings.
 
 
 56
 AFFIRMED and REMANDED FOR FURTHER PROCEEDINGS.
 
 ANDERSON, Circuit Judge, dissenting:
 
 57
 Respectfully, I dissent. In my judgment, binding precedent in this circuit requires reversal. In a very similar context, the Former Fifth Circuit held that a newly-hired permanent employee is not displaced by a returning striker "even though subsequently he may be divested of the job for failure to pass medical or security clearance." National Airlines, Inc. v. International Ass'n of Machinists and Aerospace Workers, 430 F.2d 957, 961 (5th Cir.1970). I do not agree with the majority that the conditions of employment in National Airlines--i.e., medical or security clearance--can be dismissed as merely technical. In the airline industry, the medical condition and security clearance of workers is not technical.
 
 
 
 *
 Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 Eastern maintains that 227 new-hire pilots remained in training as of November 22, 1989, while ALPA contends that at least 250 replacement pilots remained in training as of that date
 
 
 [2]
 In its brief, Eastern contends that the issue is: "Whether a bankrupt airline such as Eastern may treat new hire pilots as permanent replacements for striking pilots from their first day of training...." Eastern's status as a bankrupt airline is of little legal significance in determining whether it is obligated under the RLA to reinstate returning pilots
 
 
 [3]
 Though the courts have developed much of this striker-replacement doctrine in the context of the National Labor Relations Act (NLRA), the Supreme Court in Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants, 489 U.S. 426, 428-34, 109 S.Ct. 1225, 1229-30, 103 L.Ed.2d 456, 465 (1989), observed "that carefully drawn analogies from the federal common labor law developed under the NLRA may be helpful in deciding cases under the RLA." The Supreme Court cautioned, however, that "the NLRA 'cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes.' " Trans World, 489 U.S. at 439, 109 S.Ct. at 1233, 103 L.Ed.2d at 469 (quoting Trainmen v. Jacksonville Terminal, 394 U.S. 369, 383, 89 S.Ct. 1109, 1117-18, 22 L.Ed.2d 344 (1969))
 
 
 [4]
 Because the Supreme Court in Mackay and Fleetwood Trailer struck the balance when it held that a legitimate and substantial business justification supports an employer's decision to displace strikers with permanent replacements in order to continue operations, we do not consider the balance anew
 
 
 [5]
 We reject Eastern's contention that IOE is not part of the training/qualification process. See, e.g., Trans World, 819 F.2d at 841 n. 2 (explaining that flight attendants are not qualified to perform revenue service until they complete IOE); Rosenbalm Aviation, 15 N.M.B. 313, 314-15 (1988) (holding that IOE is part of training mandated by the FAA, and that "[a]n individual may not serve as part of the cockpit crew in revenue service until he has successfully completed the training program."). As Eastern acknowledges, IOE is necessary to obtain FAA certification