ASSOCIATION OF FLIGHT
ATTENDANTS, AFL–
CIO, Plaintiff,

v.

ALASKA AIRLINES, Defendant.

No. C93–912R.

United States District Court,
W.D. Washington,
at Seattle.

Dec. 29, 1993.

Lawrence R. Schwerin, Kathleen Phair Barnard, Schwerin, Burns, Campbell & French, Seattle, WA, Edward J. Gilmartin, Ass'n of Flight Attendants, AFL–CIO, Washington, DC, for plaintiff.

Joan Clarke, Lawrence B. Hannah, Perkins Coie, Bellevue, WA, John J. Gallagher, Paul, Hastings, Janofsky & Walker, Washington, DC, for defendant.

## ORDER GRANTING PRELIMINARY INJUNCTION

ROTHSTEIN, Chief Judge.

THIS MATTER comes before the court on plaintiff's application for a preliminary injunction. Having reviewed the application together with all documents filed in support and in opposition, and being fully advised, the court finds and rules as follows:

## I. BACKGROUND

*A. The Parties*

Plaintiff, the Association of Flight Attendants, AFL–CIO ("AFA") is a labor organization representing flight attendants employed by defendant Alaska Airlines ("Alaska"). Alaska is a common carrier by air engaged in interstate commerce. This case arises under the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.*

The most recent collectively bargained agreement between the AFA and Alaska became amendable in October, 1990. In August or September 1990, the AFA and Alaska began negotiating for a new collective bargaining agreement. Having been unsuccessful, in the fall of 1991 the parties requested and began mediation under the auspices of the National Mediation Board ("NMB"). Despite the mediation with the NMB the parties were not successful in reaching a new agreement. As of May 19, 1993 the NMB mediation efforts were terminated, and a thirty (30) day cooling-off period was announced by the NMB. At the end of the cooling-off period, June 19, 1993, having failed to reach an agreement, the NMB freed the parties to engage in "self-help".

On June 23, 1993 Alaska imposed new rates of pay, and changed some work rules and conditions of the flight attendants. On July 8, 1993 the AFA filed suit in this court alleging bad faith bargaining by Alaska and that Alaska was unlawfully attempting to undermine the union with the imposition of the work rules. The AFA also announced its plans to initiate a campaign of "CHAOS" which is an acronym for "Create Havoc Around Our System".

*B. The CHAOS Work Stoppages*

As part of the CHAOS campaign, a total of twenty-four AFA members have engaged in short-duration work stoppages. Flight attendants scheduled to work seven different Alaska flights have participated in the work stoppages on the following dates, affecting the listed flights: August 20 (flight no. 536); August 24 (flight no. 623); and September 11, 1993 (flight nos. 91, 260, 450, 451, and 455). The flight attendants have reported to work and then, within the hour before the scheduled departure time for the flight, announced to their supervisors and/or the gate agents that they were engaging in strike activity. The union simultaneously notified Alaska of the work stoppages. Then, usually within an hour, the flight attendants informed their supervisors that they were ready to return to work on that or any other flight not subject to an AFA work stoppage. None of the flight attendants were permitted to return to work upon their announcement of willingness to do so. Instead, Alaska used other individuals as flight attendants for six of those flights, and canceled one flight. Alaska also directed the flight attendants to turn in their Alaska identification cards and withdrew their travel pass benefits.

*C. The August 20 Work Stoppage*

The three flight attendants who participated in the work stoppage on August 20, 1993 offered to return to work while the affected

flight, no. 536, was being boarded by passengers. They were told by an Alaska supervisor that they could not return to work. The three CHAOS participants were directed by Alaska to turn in their identification cards and were told their travel pass benefits were withdrawn. The flight attendants were informed by letter dated August 21, 1993 that they had been withheld from service pending investigation. On September 1, 1993 Alaska informed the three flight attendants that they had been reinstated to active service retroactive to August 20, 1993. Flight no. 536 was staffed by three reserve flight attendants already employed by Alaska.

### D. The August 24 Work Stoppage

The four flight attendants who participated in the CHAOS work stoppage on August 24, 1993 offered to return to work before the affected flight, no. 623, was boarded by passengers, and before replacement flight attendants arrived. They were told their offers to return would not be accepted and were instructed to surrender their identification badges. The flight attendant's travel privileges were withdrawn. Flight no. 623 was staffed by Alaska employees from other departments. On August 25, 1993 Alaska informed the four flight attendants that they had been permanently replaced. Alaska claims to have permanently replaced the four flight attendants from flight no. 623 with four new employees, hired on August 24, 1993 but who did not staff flight no. 623. One of the four new employees voluntarily resigned on September 4, 1993. Alaska has not offered that position to any of the CHAOS participants.

### E. September 11 Work Stoppages

On September 11, 1993 five CHAOS short-duration work stoppages occurred, involving a total of seventeen flight attendants. As on the other occasions, the flight attendants announced their work stoppage shortly before the scheduled departure of the flight. When they offered to return to work a short while later, their offers were refused and their Alaska identification badges taken from them. The following flights were affected: numbers 91, 260, 450, 451, and 455. Flights no. 91 and no. 455 were staffed by three other Alaska employees. Flight no. 260 was staffed by three other Alaska flight attendants. Flight no. 450 was staffed by four of Alaska's regular reserve flight attendants. Flight no. 451 departed without passengers or flight attendants.

The flight attendants who participated in the September 11 CHAOS stoppages were informed by letter dated September 14, 1993 that they were being placed on "inactive status" and that they would not be permitted to return to work until the AFA renounced its CHAOS campaign and there were vacancies available. Alaska does not contend that it permanently replaced the September 11 CHAOS participants.

### F. Letters from Alaska to AFA Members

Since the beginning of the self-help period, Alaska has sent at least three letters to its flight attendants regarding the CHAOS campaign. The most recent letter, dated September 14, stated that "effective immediately, any flight attendant who participates in an intermittent—or "chaos"—walkout will be discharged from service with Alaska Airlines."

### G. The Relief Requested

The AFA alleges that Alaska's actions have violated the RLA by going beyond the limits of permissible self-help. The AFA seeks a preliminarily injunction ordering Alaska to do the following: 1) reinstate with back pay and benefits the twenty-one flight attendants involved in CHAOS work stoppages who have not already been reinstated; 2) reinstate all flight attendants who engage in CHAOS work stoppages (in the future) and offer to return to work prior to their permanent replacement; 3) not suspend or withdraw benefits from employees involved in CHAOS work stoppages; as well as enjoin Alaska from the following: 1) "purporting to 'permanently replace' employees who have engaged in strike activity unless such 'replacements' are in fact working in the strikers' job when the strikers offer unconditionally to return to work and are not otherwise employed by the Company in another capacity"; 2) failing to recall CHAOS participants

who were replaced when a flight attendant vacancy occurs; 3) threatening flight attendants in an effort to discourage protected concerted activity; and 4) interfering with the concerted activity of the AFA and the flight attendants in any manner prohibited by the RLA.

## II. DISCUSSION

### A. The Legal Standard

■ In order to obtain preliminary injunctive relief, the AFA must demonstrate "either (1) a combination of probable success and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardship tips in its favor." *Arcamuzi v. Continental Air Lines, Inc. ("Arcamuzi")*, 819 F.2d 935, 937 (9th Cir.1987) (citation omitted).

### B. "Protected" and "Unprotected" Activity under the RLA

■ As a preliminary matter, the court addresses Alaska's argument that the CHAOS work stoppages are 'unprotected' activity. Alaska urges this court to hold that the CHAOS work stoppages are "unprotected" activity under the RLA and thus the employer's response is not limited in the manner it would be if the activity were "protected". Under the National Labor Relations Act, (the "NLRA"), whether an employee's activity is protected or unprotected determines the permissible responses by an employer. *See e.g., NLRB v. Insurance Agents' International Union*, 361 U.S. 477, 493, 80 S.Ct. 419, 430, 4 L.Ed.2d 454 (1960). The parties have briefed this issue extensively. Alaska argues that once the parties are in the self-help period that general labor law principles apply and thus the categories established under the NLRA apply. The AFA argues that courts have specifically rejected this distinction in RLA cases.

This court finds it persuasive that the only court to address a similar situation of intermittent work stoppages in the RLA context, the Second Circuit in *Pan American World Airways, Inc. v. International Brotherhood of Teamsters, etc.*, 894 F.2d 36 (2d Cir.1990) ("*Pan Am*"), declined to adopt the NLRA distinctions, stating as follows:

Pan Am argues that intermittent work stoppages are illegal under the RLA because such stoppages are "unprotected" activity under the [NLRA]. The Supreme Court has emphasized, however, that NLRA principles 'cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes.' One relevant difference between the statutory schemes is that primary enforcement of the NLRA is by a specialized agency, the National Labor Relations Board, which is the original source of the rule that intermittent work stoppages are unprotected activity. The range of permissible statutory glosses available to such an agency is greater than that afforded courts, and we therefore decline to embark on a similar course of drawing fine distinctions between forms of self-help under the Railway Labor Act.

*Id.*, at 40. (citations omitted).

Similarly, this court finds it would be improvident to import such distinctions from the NLRA into the RLA and thus declines to determine whether the CHAOS work stoppages would be considered protected or unprotected activity under the RLA scheme.

### C. Limits to Self–Help Under the RLA

■ In *Air Line Pilots Ass'n v. United Air Lines, Inc. ("ALPA v. United")*, 802 F.2d 886 (7th Cir.1986), citing 45 U.S.C. § 152, Third and Fourth, the Court of Appeals enunciated some limit to permissible employer self-help by stating that "United was free within certain bounds to take the steps necessary to continue flying; the airline's right to employ self-help measures during the strike stopped, however, where its duties under the RLA and other laws began." *id.*, at 897 (citations omitted). The court also noted that for the self-help by the employer to be proper, the mechanisms employed by the carrier "must be shown to be reasonably necessary to keep the operation of the carrier ongoing in order to be lawful under the RLA." *id.*, at 898.

Thus, the court stated that although the parties in *ALPA* were in the self-help period, it would require

some showing of a reasonable business justification ... before a court will allow an employer to implement self-help measures which, whether intentional or not on their face, undercut the union's ability protected by the RLA to function as an effective representative for its members. The provisions of the RLA that seek to protect employees' rights to join and participate in a union would seem to require nothing less. *id.*, at 899.

The holding in *ALPA v. United* is applicable to the extent that Alaska's actions must be consistent with its duties under the RLA and reasonably limited so as not to undercut the AFA's ability to "function as an effective representative for its members".

A further limit to employer self-help is the limitation on discharge of an employee during a strike. In *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n International ("Eastern v. ALPA")*, 920 F.2d 722 (11th Cir.1990), the Court of Appeals stated that "[u]nder the RLA, airline employees remain statutory employees of the carrier during a strike unless they secure other work." *id.*, at 725. As that court said, "one of the RLA's central goals [is] the preservation of the employer-employee relationship both during and after a strike" *id.*, at 730. In *National Airlines, Inc. v. International Ass'n of Machinists & Aerospace Workers ("National I")*, 416 F.2d 998 (5th Cir.1969), the Fifth Circuit held that the airlines exceeded the permissible bounds of self-help by discharging employees who had engaged in an unlawful wildcat strike. Although the strike was unlawful, the court held that because of the concern of the RLA for "continuance of the employer's operations and the employer-employee relationship" the discharge of the strikers was inappropriate. 416 F.2d at 1006–1007. However, the workers could be permanently replaced.

In *ALPA v. United,* the court noted that the employer has a duty to "maintain the employer-employee relationship" as well as serve the public. 802 F.2d at 897. The relationship, however, is considered maintained even when permanent replacements are used. As the Eleventh Circuit stated in *Empresa Ecuatoriana de Aviacion, S.A. v. District Lodge, No. 100,* 690 F.2d 838 (11th Cir.1982), a case involving an illegal strike,

[t]he central concern of a court must be to weigh the policy of the Act, which is to keep the employer-employee relationship intact, against the policy of the carrier's being able to continue to furnish transportation service by replacing employees to the extent necessary and until the authority of the court can be brought to bear. *id.,* at 845.

Based on the above, the court finds that the AFA has met its burden of showing probable success on the merits with respect to its claim that by indefinitely suspending and/or threatening discharge of flight attendants who participated in CHAOS work stoppages, Alaska has exceeded the permissible bounds of self-help under the RLA.

### D. Harm to the AFA and its Members

■ The AFA alleges that it will suffer irreparable harm if the court does not enjoin Alaska in the requested manner because flight attendants will be discouraged from joining in CHAOS actions and will, the AFA argues, thereby be denied the right "to act to further collective bargaining demands and thereby improve working conditions." (Plaintiff's Reply Brief, p. 9). *See Arcamuzi,* 819 F.2d at 938–939 (RLA protects the right of association and expression in union activities from interference by employers. Damages and reinstatement would not remedy the coercive and inhibitory effects upon the employees' organizational rights secured by the RLA.).

Additionally, the AFA asserts that flight attendants will suffer irreparable harm if Alaska is not temporarily enjoined because the employer-employee relationship will be unnecessarily severed, a relationship that has been given a priority value under the RLA. *See National I,* 416 F.2d at 1006 (emphasis of RLA is on the continuance of the employer's operations and the employer-employee relationship).

The AFA has presented evidence that the threats of discharge by Alaska have affected

the AFA's ability to represent its membership effectively. Evidence was submitted that AFA members have questioned the ability of the union to protect them from discharge for participating in the CHAOS work stoppages. Thus, in this way, in addition to the above, Section 2, Fourth, of the RLA is implicated.[1]

The court finds that the AFA has made a substantial showing that the threat of discharge is unlawful self-help. Additionally, the AFA has demonstrated that this threat of discharge has served to chill participation by AFA members in union activity and may result in irreparable harm.

### E. Permanent Replacement in the CHAOS Context

Under the RLA, Alaska "has the duty to make all reasonable efforts to continue its operations during a strike", *Brotherhood of Ry. & S.S. Clerks, etc. v. Florida E.C.R. Co.,* 384 U.S. 238, 247, 86 S.Ct. 1420, 1425, 16 L.Ed.2d 501 (1966), and has a "responsibility to the public to maintain the public service at all times". *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 809 F.2d 483, 486 (8th Cir.1987), *aff'd,* 485 U.S. 175, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988).

■ Under the RLA, as under the NLRA, an employer may permanently replace strikers. *See e.g., Eastern v. ALPA,* 920 F.2d at 725; *Trans World Airlines v. Independent Federation of Flight Attendants,* 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989). Although the parties dispute the requirement of showing some business necessity in order to permanently replace strikers, the court finds that, on the record before it, Alaska has made such a showing. In order to fulfill its obligations to maintain operations, Alaska may properly resort to using permanent replacements.

■ To become permanent replacements, individuals must perform "the work ordinari-

ly discharged by the former strikers". *Eastern v. ALPA,* 920 F.2d at 728. In determining the *Eastern v. ALPA* case, the Eleventh Circuit quoted the RLA definition of "employee" as follows:

> every person in the service of a carrier (subject to its continuing authority to supervise and direct the manner of rendition of his service) who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect. . . . 45 U.S.C. § 151, Fifth.

920 F.2d at 726; *see also ALPA v. United,* 802 F.2d at 913 (unless a person has performed services for the employer under that employer's supervision he is not an employee for purposes of the RLA).

This court accepts as true Alaska employee Nick McCudden's sworn assertions that the four employees hired to permanently replace the four CHAOS participants on August 24, 1993 did indeed perform services as flight attendants prior to the offers to return to work by the four CHAOS participants. Given that fact, although the four replacements did not staff flight no. 623, upon their performance of services as flight attendants for Alaska they became replacements for the four CHAOS participants.

■ As to the seventeen CHAOS participants which Alaska does not claim to have permanently replaced, the court finds that the AFA has made a sufficient showing that their indefinite suspension constituted impermissible self-help and that upon their unconditional offers to return to work, the CHAOS participants were entitled to reinstatement. *See NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967). The court further finds that the AFA has made a sufficient showing that the indefinite suspension will irreparably harm it by affecting its ability to serve as an effective bargaining representative for its members. As no permanent replacement is claimed, nor

---

1. Section 2, Fourth, of the RLA provides: No carrier . . . shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its

employees, . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . 45 U.S.C. Sec. 152, Fourth (1982).

does the court find any business justification for their suspension, the seventeen must be reinstated.

 While the court has found that permanent replacement is the appropriate self-help tactic available to Alaska, it is apparent that this tactic must be flexible enough to enable Alaska to counter the somewhat unorthodox methods employed by the union in the CHAOS campaign. To calcify the response of one side in the self-help period while allowing the other side to utilize innovative means would be to upset the balance during this period and render Alaska unable to meet its obligation to maintain service to the public. Permanent replacement in this circumstance shall not require Alaska to make available to permanently replaced flight attendants vacancies created by later CHAOS participants engaged in intermittent work stoppages. Otherwise, the result would be a revolving door of positions. In order to address this situation, the court finds that the ends of the RLA would best be served by prohibiting the discharge and/or indefinite suspension of CHAOS-participating flight attendants, yet finding that those flight attendants are only entitled to reinstatement to fill vacancies other than those created by such a CHAOS work stoppage.

### III. CONCLUSION

Based on the above findings that the AFA has shown the probability of success on the merits and the possibility of irreparable harm, the court ORDERS that:

1. Alaska reinstate the seventeen flight attendants indefinitely suspended on September 11, 1993, with back pay and benefits retroactive to the time they offered unconditionally to return to work;

2. Alaska is hereby ENJOINED from indefinitely suspending, discharging, or threatening to discharge flight attendants who participate in CHAOS intermittent work stoppages;

3. Alaska may permanently replace workers who participate in CHAOS intermittent work stoppages if the replacements perform services as flight attendants before the CHAOS participants unconditionally offer to return to work;

4. Permanently replaced CHAOS participants shall not be eligible for vacancies created by later CHAOS participants, but shall be eligible for other vacancies; and

5. Alaska shall reinstate Wally Goelzer, the most senior flight attendant from the August 24, 1993 CHAOS work stoppage, to fill the vacancy created by the voluntary resignation of the permanent replacement hired on that date.